ROBERT W. THOMPSON (Bar No. 250038)
THOMPSON LAW OFFICES, P.C.
700 Airport Boulevard, Suite 160
Burlingame, CA 94010
Telephone: 650.513.6111
Facsimile: 650.513.6071
Email: bobby@tlopc.com

Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIELLE KETTLER, individually and as parent of J. Kettler and on behalf of a class of others similarly situated; and WILLIAM LENTZ, individually and as parent of L. Lentz and on behalf of a class of others similarly situated; <br><br> Plaintiff, <br><br> v. <br><br> REACH AIR MEDICAL SERVICES, LLC, a California Company; <br><br> Defendants. | Case No.: <br><br> CLASS ACTION COMPLAINT FOR DAMAGES <br><br> 1) Injunctive and Declaratory Relief <br> 2) Breach of Implied Contract <br><br> JURY TRIAL DEMANDED |

Plaintiff Danielle Kettler, individually and as parent of J. Kettler, and Plaintiff William Lentz, individually and as parent of L. Lentz, by and through their counsel, brings this action individually and on behalf of all others similarly situated ("The Class"), and allege as and for their Class Action Complaint against Defendant Reach Air Medical Services, LLC, upon personal knowledge as to herself and their own acts, and as to all other matters upon information and belief, based upon investigation made by her attorneys, as follows:

///

///

1

COMPLAINT FOR DAMAGES

**INTRODUCTION**

1.    Plaintiffs bring this action individually and on behalf of a class of others similarly situated,[1] against Defendant Reach Air Medical Services, LLC. In this case, the Court must address the intersection of the Airline Deregulation Act of 1976's ("ADA") preemption provision, 49 U.S.C. § 41713(b)(1), and Defendant's efforts to collect for emergency helicopter air ambulance transports. Plaintiffs are the parents of children transported by Defendant in an emergent situation where there was no contractual relationship and no agreement with respect to the transports. Any obligation on Plaintiffs and the Class to pay Defendant, if any, arises solely out of state common law in California.

2.    Plaintiffs bring this proposed class action on behalf of themselves and all others similarly situated, charged by Defendant for the transportation of patients by air ambulance. For individuals like Plaintiffs, first responders or medical personnel generally determine whether a patient needs emergency helicopter transport. The transportation is often arranged, and patients are transported, without their knowledge or express or informed consent, or under the duress of life-threatening or other serious medical conditions that require immediate treatment at a hospital. There is no express contract for the payment of the prices charged for the transportation between Plaintiffs and Defendant. Given the dire circumstances, express or informed consent or negotiation of essential terms is difficult, if not impossible, because the patient is either unconscious or otherwise incapable of giving meaningful express or informed consent. Even if the parties could, theoretically, negotiate the terms of a contract, Defendant refuses to disclose its pricing, so a missing material term precludes the forming of an express contract.

3.    This case is brought on behalf of patients transported under emergent medical circumstances.  By virtue of these circumstances no contractual relationship is formed prior to

---

[1] For simplicity, rather than reciting "and the Class" each time Plaintiffs are mentioned, this pleading will refer to Plaintiffs. Such usage includes the class Plaintiff seeks to represent.

2

transport, the Plaintiffs' medical condition is emergent, and Defendants do not disclose the amounts they intend to charge for such transportation. Plaintiffs have no legal obligation to pay the Defendants the price charged for services, and one may not be imposed them by state law by virtue of the ADA pre-emption: "[A] state … may not enact or enforce a law, regulation, or other provision having the forced and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1).

4.    After the transportation is complete, Defendant sends a charge for the transportation comprised of the total of a "mileage" charge and a "helicopter rotor base charge", (collectively "charged amount") and demands payment from the Plaintiffs and the Class. Plaintiffs can include the patient transported, the legal custodian of the patient (in the case of minor patients), the estate of a deceased patient, or any person or entity from whom Defendant has demanded payment. The rate that will be charged by Defendant for the "base charge" and "mileage" is known to Defendant prior the transportation, but it is not published on its web site or otherwise disclosed to Plaintiffs. Even in instances where a family member, or even less frequently, a coherent patient themselves, signs a document with Defendant before a transport, that document does not disclose the prices to be charged. The refusal by Defendant to disclose prices is consistent with its longstanding argument that its pricing is some sort of trade secret. Defendant refuses to disclose its pricing information to prospective transport patients.

5.    Defendant bills Plaintiffs an amount that vastly exceeds both the cost to provide the transport and the fair market value of the transport. The Vice President of Air Methods Corporation, one of the largest air ambulance companies in the United States, stated that if "everybody paid their fair share, you know what the charge for this service would be? $12,000." Similar testimony was given under oath by an executive of another large air ambulance company, PHI, asserting that, on average, its operations were profitable by collecting $12,000 per transport. But Defendant charges at least four times that amount and more, with the average charge for the Plaintiffs at nearly $51,000, more than four times the "fair charge."

3

6.    The price comprising the charged amount is never disclosed to Plaintiffs by Defendant, nor is the price charged agreed to, or negotiated by Defendant and the persons charged prior to transportation of the patient. The price comprising the charged amount was not disclosed to the Plaintiffs by Defendant, nor is the price charged agreed to or negotiated by Defendant and the persons charged prior to transportation of the patient. As such there is no express contract between the Plaintiffs and Defendant as to the price to be charged for any services provided.

7.    As is customary in healthcare, patients routinely assign their insurance benefits to the healthcare provider so the provider may file claims with third party insurers to obtain payment benefits. Defendants use the assignment to directly file claims with third-party payors to obtain payment asserting that their services were for necessary, emergency medical transportation. The third-party payors make coverage determinations and issue an Explanation of Benefits detailing the charged amounts and the reasons for their coverage determinations. This is followed by an appeal process which Defendants may, and frequently do initiate.

8.    As part of their predatory scheme. Defendant, post transportation, have Plaintiffs sign "assignment of benefits" prepared by Defendants without negotiation nor modification. These forms do not disclose the prices Defendant charges for its services, which, in fact, the Defendant never discloses, and seek to bind Plaintiffs to pay *whatever* Defendant charges, irrespective of the reasonableness of the charged amounts. These documents are not voluntary agreements, do not disclose any price terms and are unenforceable.

9.    Many, if not most, of the persons transported by Defendant are incapable of entering a contract: they are unconscious, in severe distress, or they are medicated. Plaintiffs who did not enter into express contracts fall into a quirky corner of the legal universe affected by the ADA. Because Defendant failed to disclose price, if any contractual obligations for Plaintiffs to pay any amount, those obligations must be based upon state law.

4

10. As is customary in healthcare, patients routinely assign their insurance benefits to the healthcare provider so the provider may file claims with third party insurers to obtain payment benefits. Defendant use the assignment to directly file claims with third-party payors to obtain payment asserting that their services were for necessary, emergency medical transportation. The third-party payors make coverage determinations and issue an Explanation of Benefits detailing the charged amounts and the reasons for their coverage determinations. This is followed by an appeal process which Defendant may, and frequently does initiate.

11. As part of their predatory scheme. Defendant, post transportation, has Plaintiffs sign Assignment of Benefits and other forms prepared by Defendant without negotiation nor modification. These forms do not disclose the prices Defendant charges for its services, which in fact the Defendants never disclose, and seek to bind Plaintiffs to pay whatever Defendants charge irrespective of the reasonableness of the charged amounts. These documents are not voluntary agreements, do not disclose any price terms and are unenforceable. Defendants enlist the assistance of the Plaintiffs in the process and provides form documents for the Plaintiffs to sign and transmit to their third-party insurers.

12. However, where the Plaintiffs insurers, or third-party payors do not have network agreements with the Defendants, and reimburse only the reasonable amount for the Defendants services, Defendants "balance bill" the Plaintiffs the difference between third party payor reimbursement, and Defendants charged amount. The balance billing process also initiates collection efforts, including dunning letters, telephone calls seeking payment, threats to turn the bills over to collection agencies, coercing payment plans, imposing medical liens against third party recovery, turning the unpaid amounts over to collection agencies, making claims against the estates of deceased patients, imposes cost of collection, attorneys fees and interest on unpaid amounts, and, in some instances, filing state-court breach of contract claims and other suits against patients.

13. The Defendant's charges are so exorbitant that almost no third-party payor pays them in full, frequently leaving a staggering amount to be balance billed. Because the Defendant's balance bills are so high, frequently in the $10,000s, most patients cannot pay

them. Defendant's actual collection rates for these receivables are very low (less than 5% pay the full billed amount).

14.    After appeals for third-party payment are exhausted, Defendant proceeds with collection efforts against the Plaintiffs. Upon information and belief Defendant engages in this practice to:

        a.    increase the economic pain on the Plaintiffs so as to give Defendant leverage against third party payors in appealing reimbursement rates;

        b.    threaten Plaintiffs with harsh collection efforts to coerce them into negotiated payment plans; and

        c.    to gain negotiating leverage in obtaining terms more favorable to them in network agreements with third party payors.

15.    Defendant's billing practices as stated are predatory, unconscionable, and intended to inflict sever economic pain on critically injured Plaintiffs solely for the benefit of the Defendant: essentially a "your money or your life" scheme.

16.    Ascertainability of the patients transported in this regard will be easy as Defendant employs a standard "Authorization and Consent" and get the same executed at the time of transport if the patient is able to sign a contract, regardless if there is any indicator that the patient is competent to enter an agreement.  On information and belief, if the patient cannot execute the authorization, a crew member of Defendant will sign the agreement on behalf of the patient and indicate the reason why the patient cannot sign.

17.    The Class will include the patient transported, the legal custodian of the patient (in the case of spouses or minor or mentally disabled patients), the estate of a deceased patient, or any person or entity from whom Defendant has demanded payment for helicopter ambulance transport of themselves or another. It is expected that for each transport, there will be only one class member, though for married couples, it may be both the transported person and their spouse.

18.    In this action, Plaintiff, on behalf of herself, seeks a declaration with respect to Plaintiff's legal obligation, if any, with respect to payment to Defendant of the price charged

6

for the transportation services provided and for the Court to determine the unspecified price term. For those without signed written contracts, Plaintiffs ask the Court to find that no obligation to pay can exist given preemption analysis under the ADA. For those with signed authorizations or contracts, Plaintiffs ask the Court to find that the absence of a price term fails to establish the existence of a contract unless common law with respect to an implied contract supplies a reasonable price term. Thus, ADA preemption still does not permit Defendant to collect from Plaintiffs with a signed authorization specifying a price, absent an exception to ADA preemption under Plaintiffs' second cause of action.

19.    Defendant's legal position is expected to be that the Airline Deregulation Act vested it with plenary power to set whatever price it chooses for transportation of patients *in extremis* who have no opportunity to decide whether they want or need transportation, and this Court, and all other courts, are powerless to decide issues related to the arbitrary and inflated prices imposed after-the-fact by Defendant.

20.    The ADA, 49 U.S.C. § 41713(b)(1) provides:

[A] State, political subdivision of a State...may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

21.    The text of the ADA reveals that Defendant is not a "common carrier," which is a prerequisite to being an "air carrier."   An "air carrier" provides "air transportation" which means "transportation of passengers...as a *common carrier* for compensation." 49 USC §40102(a). A "common carrier" is defined as "any carrier required by law to convey passengers...without refusal if approved fare or charge is paid in contrast to private or contract carrier." BLACK'S LAW DICTIONARY (emphasis added).   Irregular routes indicate that a carrier is not a "common carrier."   The definition from BLACKS was cited with approval in a D.C. Circuit opinion interpreting the term "common carrier," and the case also cited the presumption set by the Supreme Court of "following the common law usage where Congress has employed

a term with a well-settled common law meaning." *CSI Aviation Servs v. United States DOT*, 637 F.3d 408, 415 (D.C. Cir. 2011) (finding that the company in that case was not an "air carrier" because they did not meet the definition of a "common carrier"). The absence of "approved fares or charges," in fact even publicly disclosed prices, and the absence of regular routes with fixed end points, make clear that Defendant is not a "common carrier" and should thus not be deemed an "air carrier." *Alves v. Pub. Utils. Comm'n*, 260 P.2d 785, 788 (Cal. 1953) (discussing the differences between a "common carrier between fixed termini and over regular routes" and a "highway contract carrier" that does not operate between fixed termini and over regular routes); *Railroad Comm'n of Tex. v. Cent. Freight Lines, Inc.*, 434 S.W.2d 911, 916 (Tex. App. 1968) (discussing the differences between carriers operating over "regular routes" and between fixed termini and those on "irregular routes"). However, the courts have uniformly rejected this analysis, so Plaintiffs do not assert it herein.

22.    Defendant sends a statement for the charged amount to the Plaintiffs and demands payments for prices that the Plaintiffs never agreed to pay. In the absence of payment, Defendant initiates collections, report the amount charged as an unpaid bill to credit reporting agencies, engage in collection efforts, and seek to enforce liens via lawsuits in state courts, or seek to enforce state law related to the price or services they provide.

23.    Defendant has the option to negotiate an agreed rate with Plaintiffs' insurers. Defendant has failed or refused to enter such negotiations preferring, instead, to impose charges unilaterally after the Plaintiffs already had been transported. Defendant makes more money by refusing to negotiate and instead attempting to impose its excessive prices on Plaintiff after the fact. The Tenth Circuit described the situation thus: "Unscrupulous pricing behaviors that would not be sustainable in a true free market...are easily perpetuated in the

COMPLAINT FOR DAMAGES

warped market of air-ambulance service." *Eaglemed, LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017).

24.   Courts have taken a variety of approaches to air ambulance claims. *Wagner v. Summit Air Amb. & Reach Air Med*, 2017 U.S. Dist. LEXIS 177709, 2017 WL 4855391 (D. Mont. Oct. 26, 2017), refused to dismiss a complaint asserting claims like Plaintiffs herein assert. *Wagner* found that the defendant air ambulance companies in that case "knowingly incorporated a consideration term of 'reasonable worth' by their self-imposed and voluntary undertaking to omit a specific consideration term." Plaintiff alternatively, in the Second Cause of Action, assert the same type of claims herein as those asserted in *Wagner* for the signed written contract class.

25.   Absent an express, non-preempted, agreement between Plaintiffs and Defendant regarding the prices Defendants charge, Plaintiffs have no legally enforceable obligation to pay Defendant for the transportation services they provided, nor are they legally obligated to pay any amount that might be imposed by operation of state law.

26.   Contrary to the Defendant's expected contentions, ADA pre-emption applies equally to Plaintiffs and Defendant, to patients and air transportation providers alike. There is no federal law mandating payment for the payment of air carrier services. Applying the ADA preemption provision to the Defendant, means they cannot employ or enforce any State law having the force and effect of law "related to price, route or service of an air carrier". Three United States Supreme Court cases, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 375 (1992); *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995); and *Northwest, Inc. v Ginsburg*, 572 U.S. 273 (2014) construe the preemption provision broadly, excluding only "privately ordered obligations." *Wolens*, 513 U.S. at 228. "[T]he terms and conditions airlines offer and passengers accept, are privately ordered  obligations  and thus do not amount to a State's

1   enactment or enforcement of any law, rule, regulation, standard, or other provision having

2   the force and effect of law within the meaning of the ADA pre-emption provision." *Id.* Many

3   circuit court and district court rulings are in accord. Recently, the 10th Circuit Court of Appeals

4   in *Scarlett v. Air Methods,* 922 F. 3d 1053 (10th Cir. 2019) ruled that Defendant's legal

5   entitlement to payment can only be premised upon a contract establishing mutual assent by both

6   Defendant and the patient. No such mutual assent exists between Plaintiffs and Defendant.

7

### PARTIES

8       27.   Upon information and belief, Defendant REACH AIR MEDICAL SERVICES,

9   LLC ("REACH") is incorporated under the laws of California with a principal place of

10  business at 4933 Bailey Loop, McClellan CA 95652. Defendant REACH is a subsidiary of Air

11  Medical Group Holdings ("AMGH"), which is owned by KKR & Co., Inc. ("KKR"), a well-

12  known venture capital group.

13      28.   Plaintiff Danielle Kettler and her minor child J. Kettler reside in Sonoma

14  County, California.

15      29.   Plaintiff William Lentz and his minor child L. Lentz reside in El Dorado

16  County, California.

### JURISDICTION AND VENUE

17      30.   This Court has original jurisdiction pursuant to 28 U.S.C § 1331 and

18  § 1332(d)(2). The matter arises under the laws of the United States, in particular 49 U.S.C.

19  § 41713(b)(1). Further, the matter in controversy, exclusive of interest and costs, exceeds the

20  sum or value of five million dollars ($5,000,000.00) and is a class action in which Plaintiffs

21  and members of the Class are citizens of states different from Defendant.

22      31.   This Court has personal jurisdiction over Defendant because it is authorized to do

23  business and are conducting business throughout the State of California; it has sufficient

COMPLAINT FOR DAMAGES

minimum contacts with the California; and/or sufficiently avail itself of the markets of the various states of the United States, including California, to render the exercise of jurisdiction by this Court.

32.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this claim occurred in this District, Defendant maintains offices in this District and is subject to personal jurisdiction in this District. Venue is also proper because: (a) Defendants are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District; (b) do substantial business in this District; and (c) are subject to personal jurisdiction in this District.

## FACTS

**Plaintiff Kettler**

33.    Shortly after Plaintiff Kettler gave birth to her son J. Kettler on May 11, 2018, he began to experience severe respiratory problems in Sonoma Valley Hospital in Sonoma, California ("Sonoma Valley"). Sonoma Vally lacked a neonatal intensive care unit ("NICU"), and J. Kettler needed the level of care that could only be provided by a NICU. Therefore, hospital staff advised Plaintiff Kettler that her son's life depended on getting him to a hospital with a NICU.

34.    On May 13, 2018, Defendant transported J. Kettler from Sonoma Valley Hospital in Sonoma, California to Santa Rosa Memorial Hospital in Santa Rosa, California.

35.    Plaintiff Kettler signed paperwork prior to the transportation, but she has no recollection of what it was. A clipboard with lots of paperwork was put in her hands, and she believes it included discharge / transfer paperwork from the hospital. She has now knowledge of whether it included paperwork from Defendant. Reach personnel did verbally give Plaintiff Kettler limited information about the transport. None of Defendant's employees or hospital

staff explained to her exactly what it was she signed, and she did not have time or the capacity to meaningfully read through the form before signing because of the urgency of the situation. None of Defendant's personnel explained pricing for the transport.

36.    Following the transport, Defendant billed Plaintiff Kettler $56,357.50, which included a "base" charge of $42,500 and an additional $13,755 for mileage. The trip was 35 miles, making the charge per mile $393. Plaintiff Kettler was charged an additional $112.50 which was characterized as "other charges."

37.    Plaintiff Kettler was insured by Western Growers Assurance Trust, which paid $20,578.78. This left an alleged remaining balance of $35,778.72. Plaintiff Kettler appealed this decision, but her appeal was denied. On information and belief, Kettler that the payment by Western Growers Assurance Trust allowed Defendant to recover its costs plus a reasonable profit.

38.    After the air ambulance ride, Plaintiff Kettler met with a social worker, which is customary with NICU babies. Plaintiff Kettler was informed that all NICU babies are automatically enrolled in California Children's Services, which the social worker suggested should help cover some of the air ambulance. However, a few weeks later that Plaintiff Kettler was notified that we did not qualify for that service.

39.    Following Plaintiff Kettler's receipt of the bill, she has received multiple letters and phone calls from Defendant attempting to collect the remainder of the balance allegedly owed. Documents related to Plaintiff Kettler's case are attached as Exhibit A.

40.    Defendant's actions have caused Plaintiff Kettler, a new mother, stress and insomnia. She put off buying a new car, which her family needs to accommodate its growing size. Her husband is a disabled vet diagnosed with PTSD, and she has had to shelter him from this incident to protect him.

///

12

COMPLAINT FOR DAMAGES

**Plaintiff Lentz**

41.    On April 20, 2019 minor L. Lentz had fainted outside of Royal Dragon Chinese in Georgetown, California. Responding paramedics transported him to Beam Field (approximately ¼-mile away in Georgetown) and called for a "life flight" from Defendant. Prior to Defendant's arrival on scene, L. Lentz had regained consciousness. Neither Plaintiff Lentz nor his minor son L. Lentz agreed to the "life flight," and Plaintiff Lentz and his son do not believe they signed any paperwork. To the contrary, L. Lentz explicitly told the paramedic that he did not want the "life flight" because he had simply fainted because of poor sleep the night before and not eating. L. Lentz was only unconscious for a couple of minutes, and he did not have any meaningful contusions or bleeding.

42.    Defendant and its employees ignored L. Lentz's explicit instructions, and instead they transported him 25 miles to Sutter Medical in Roseville, California.

43.    At the hospital, a female representative of Defendant stuck a clipboard in Plaintiff Lentz's face and sweetly asked him to sign. She said it would let Defendant bill California Medicaid, which she said Plaintiff Lentz should apply for. Plaintiff Lentz later looked into Medicare, but he made too much to qualify. Plaintiff Lentz has no idea what he actually signed, but it was signed after the transport.

44.    Following the transport, Defendant billed Plaintiff Lentz $56,435.05. Charges included a "base rate" of $45,475.00, 25 "loaded miles" at $421 per mile for a charge of $10,525.00, and "other charges" of $435.05. The total billed was $56,435.05.

45.    L. Lentz had Chapa-De Native American health insurance, but they refused to pay any of the bills. Generally, Chapa-De coverage only pays for in-clinic care. See https://chapa-de.org/eligibility-payment-options/ (see discussion of "Purchased / Referred Care").

46.    Defendant has demanded payment of the entire bill. Plaintiff Lentz did not have insurance at the time, but he has made monthly payments by check in the amount of $25 each since September 2019. Documents related to Plaintiff Lentz's case are attached as Exhibit B.

## DEFENDANT'S PRIOR COLLECTION AND LITIGATION

47.    On information and belief, Defendants have, without any legal entitlement to payment:

        a.    filed multiple state-court breach-of-contract suits in multiple states to collect their charges, both by direct actions against a transported person and by way of making claims in interpleader actions;

        b.    filed proof of claims in multiple bankruptcy cases asserting a right to be paid based on state-law breach-of-contract theories;

        c.    filed claims in estate cases to recover their charges for transportation of a deceased person in multiple cases;

        d.    sought more compensation from Medicare, Medicaid and Tricare insureds than is allowed under the relevant payment schedule for providers that accept assignment of benefits from Medicare, Medicaid and Tricare patients;

        e.    sought more compensation from patients with commercial insurance, employer-sponsored health benefits plans, and other non-governmental third-party payers than what the insurance industry has determined to be the uniform, customary, and reasonable rate in each locality:

        f.    coerced class members to enter into payment plans to pay their full billed amount in monthly installments paid over decades with interest; and

        g.    enforced, or sought to enforce, subrogation claims or liens against personal injury claims or recoveries seeking their full billed amounts.

48.    Defendant's collection efforts against Plaintiffs were ongoing at the time this action was filed, and Defendant will continue efforts to collect their improperly billed amounts in the absence of relief granted by the Court in this action.

14

49.    There is a live and ongoing dispute between Plaintiffs and Defendant.

## CLASS ACTION ALLEGATIONS

50.    This action is brought and may be maintained as a class action pursuant to Fed. R. Civ. P. 23. The requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3) are met with respect to the Class defined as follows:

> All persons billed by Defendant, or who paid a bill from Defendant, for air medical transport that Defendant carried out from a location in California.

> Excluded from both Classes are Defendant, any entity in which Defendant has a controlling interest or which have a controlling interest of Defendant, and Defendant's legal representatives, assigns and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

51.    Plaintiff expects to seek certification of the Class under Rules 23(b) (1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

52.    The Classes will include only persons having viable claims under the applicable statute of limitation.

53.    Rule 23 permits Plaintiff the right to redefine the Classes prior to class certification.

54.    The members of the Classes are so numerous that joinder of all members is impracticable. The exact number of Class Members is unknown as such information is in the exclusive control of Defendant. However, due to the nature of the trade and commerce involved, Plaintiffs believe the Class includes thousands of members.

55.    Publicly available data bears on numerosity. There are circa 400,000 rotary wing air ambulance transports in the United States and another 150,000 fixed wing transports. See https://aams.org/member-services/fact-sheet-faqs/. The median number of transports per air ambulance base is around 294 per year. See https://aams.org/wp-content/uploads/2017/04/Air-Medical-Services-Cost-Study-Report.pdf (Table 7 at p.10 data for "for-profit" bases).

15

1  Defendant appears to have 14 bases in California. See Figure 1, adjacent (figure taken from

2  https://reachair.com/services/service-areas/). Based on the foregoing data, there are circa 4,116

3  transports by Defendant annually originating in California. The foregoing ignores transports by

4  Defendant's affiliates: Cal-Ore Life Flight, Calstar, Sierra Lifeflight, American Medflight,

5  and CareConnect.



**Figure 1: Reach Service Area**

56.    Common questions of law and fact affect the rights of each Class Member and

a common relief by way of declaratory judgment and injunction, including at least

the following:

     a.    Did the Defendant have a fixed mileage price and "helicopter rotor base" price for
the transportation before Plaintiffs and Class Members were transported?

16

b.    Did Defendant communicate its fixed mileage price and "helicopter rotor base" price for the transportation to Plaintiffs, actually or constructively, before the patients were transported?

c.    Did Defendant demand payment of a fixed mileage price and "helicopter rotor base" price for the transportation of patients when the mileage and helicopter rotor base prices sought had not been expressly agreed to by Plaintiffs?

d.    What voluntary undertakings did Defendant accept regarding transportation of Plaintiffs?

e.    Is there any non-preempted basis for Defendant to recover its billed fees other than via state law claims for express signed contract?

f.    Whether Defendant could contract around the Court supplying the price by, for example: i) publicly disclosing its prices, for example on its web site; ii) disclosing pricing on its written contracts; or iii) negotiating with Plaintiffs' insurers on an agreed rate?

g.    Whether the Court should grant injunctive relief to Plaintiffs who do not have a signed contract with Defendant to prevent the all further collection efforts by Defendant?

h.    Whether Plaintiffs who paid or had a third-party payor pay some or all of the charges be granted restitutionary relief for payment where there is no obligation to pay?

i.    Whether Defendant should be enjoined from seeking to collect amounts not agreed to by the parties

j.    Whether Defendant is entitled any payment from Plaintiffs and, if so, the proper mechanism to determine the amount owed.

57.    The claims and defenses of the named Plaintiffs are typical of the claims and defenses of the Classes. Defendant sought to collect an alleged debt for which it had no valid basis for collection since any efforts to impose a price by any court would be preempted under the ADA.

58.    The named Plaintiffs will fairly and adequately assert and protect the interests of the Classes. Specifically, they have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes. Neither the named

Plaintiffs nor putative class counsel have a conflict of interest that will interfere with the maintenance of this class action.

59.    A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons:

a.    The Class is so numerous as to make joinder impracticable but not so numerous as to create manageability problems;

b.    Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendant when confronted with incompatible standards of conduct;

c.    Adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and

d.    Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

e.    There are no unusual legal or factual issues which would create manageability problems; and

f.    Class adjudication is superior to individual adjudication of the claims at issue in this case.

## CAUSES OF ACTION

### First Cause of Action

### (Injunctive and Declaratory Relief Pursuant to 28 U.S.C. § 2201)

60.    Plaintiffs incorporate the paragraphs outside of this Count as though set forth herein.

61.    28 U.S.C §2201 provides as follows:

In a case of actual controversy within its jurisdiction...any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

62.    Prior to the provision of services, no negotiation of contract terms regarding the price of Defendant's transportation services took place and Plaintiffs and Defendant did not enter into an express agreement on the price that Defendant would charge and the Plaintiffs would pay for transport services.

63.    In all instances, Defendant seeks assistance from the Plaintiffs to obtain third-party payment for the charged amounts.

64.    If there is no third-party payment or that payment is less than the charged amounts, Defendant demand payment ("balance bills"), threaten adverse consequences, and initiate detrimental collection efforts against Plaintiffs.

65.    In the event Plaintiffs do not pay Defendant the charged amounts, Defendant threatens collection, report the unpaid charged amount as bad debt to credit reporting agencies, accrue interest and fees, and ultimately may file suit in state court or claims in bankruptcy for the amounts charged to coerce Plaintiffs to make payments that they do not owe, and Defendant cannot legally collect.

66.    Plaintiffs seeks injunctive and declaratory relief for the purposes of determining questions of actual controversy between the Plaintiffs and Defendant, and to determine what rights Defendant has to collect their alleged debts from Plaintiffs.

67.    Defendant has acted in a uniform manner in failing to disclose and negotiate the price they would charge for transportation services before rendering services, balance billing the Plaintiffs in the event the charged amounts are not paid and engaging in collection efforts.

68.    Defendant has acted or refused to act on grounds that apply generally to Plaintiffs such that declaratory relief to determine whether Defendant and Plaintiffs have an enforceable agreement, the enforcement of which is not preempted by the ADA, so that final injunctive

COMPLAINT FOR DAMAGES

relief or corresponding declaratory relief is appropriate respecting the Class as a whole within the meaning of Fed. R. Civ. P. 23.

69.    Defendant has demanded payment of the charged amounts from the Plaintiffs and have threatened or initiated collection efforts against the Plaintiffs.

70.    There is an actual dispute and controversy between Plaintiffs and Defendant as to whether Defendant can demand payment for services concerning which no express price was agreed, can engage in collection efforts where no legally enforceable contract exists, can impose interest and costs of collection on Plaintiffs, and whether any attempt by Defendant to collect the amounts charged under the circumstances is prohibited by the preemption provisions of the ADA.

71.    Plaintiffs have no adequate remedy at law.

72.    Plaintiffs seek declarations to determine the rights of the Class Members, in particular:

a.    The Court finds that Defendant and Plaintiffs, and the Class did not enter into any contract, either express or implied, for Plaintiffs and the Class to pay the amounts charged by the Defendant for the transportation services it provided;[2]

b.    The Court finds that Defendant has engaged in collection efforts against Plaintiffs and the Class for amounts that the Plaintiffs and the Class did not contractually agree to pay;

c.    The Court finds that Defendant has engaged in collection efforts against Plaintiffs and the Class for amounts concerning which there was no mutual assent manifest by the Plaintiffs and the Class prior to the rendering of the services charged;

d.    The Airline Deregulation Act pre-empts the imposition of any state common law contract principles that impose terms upon Plaintiffs which those parties did not expressly assent to prior to the air medical transportation services provided to them;

e.    The Court finds that the emergency medical circumstances of Defendant's medical air transportation were such that patients transported cannot be implied to have entered

---

[2] But see Plaintiffs' alternative prayer below, in the Second Cause of Action, for a finding that an implied contract exists between the parties.

COMPLAINT FOR DAMAGES

into any contract for transportation, and in particular any agreement to pay whatever Defendant charged;

        f.    The Court finds that Airline Deregulation Act pre-empts application of state law imposing or implying any agreement upon the Plaintiffs to pay Defendant's charged amounts; and

        g.    The Court finds that Defendant's collection of any sums, absent an enforceable contract with the Plaintiff charged, was unlawful and the sums received by Defendant disgorged.

    73.   Plaintiffs further seek a prospective order from the Court requiring Defendant to: (1) cease charging for the transporting of patients without an express agreement or full disclosure as to the rates for mileage and helicopter rotor base; and (2) to cease its attempts to collect outstanding bills for which no agreement as to price exists from Plaintiff and the Members of the Proposed Class, except at a price that Defendant has undertaken for the Court to set.

    74.   Plaintiffs and the Proposed Class seek the disgorgement by Defendant of all sums collected by the Defendant from third-party payors who Defendant did not have a preferred provider contract with, who have paid any amounts charged by the Defendant and other relief as set forth in the prayer below.

    75.   Defendant's collection efforts damage the credit or financial health of Plaintiffs, cause them to incur legal fees and litigation expenses, impede their ability to resolve personal injury claims, force them to consider filing or file bankruptcy, and expose Plaintiffs to claims for unlawful rates, interest on unpaid Defendant's charges and vexing and harassing collection efforts. As a result of Defendant's practices as described above, Plaintiffs have suffered, and will continue to suffer, irreparable harm and injury.

    76.   Accordingly, Plaintiffs respectfully ask the Court to enter a permanent injunction ordering Defendant to cease and desist its practice of charging Plaintiffs for transporting patients in any amount greater than the reasonable amount set by the Court.

1

2

## Second Cause of Action - ALTERNATIVE[3]

### (Breach of Implied Contract)

3     77.    Plaintiffs repeat and re-allege paragraphs outside of this Count as if fully

4 restated herein.

5     78.    Prior to the receipt of services, no negotiation of contract terms took place and

6 Plaintiffs and Defendant did not enter into either a written or oral agreement on the essential

7

8 terms    of    any    contract,    particularly    the    price    Defendant    charged    for

9 transport services.

10     79.    Prior to sending Plaintiffs a bill, Defendant never disclosed the rates it charges for

11 its services. As these agreements contained an undefined price term, they constituted, if

12

13

_____

14     [3] Absent ADA preemption, application of implied contract principles to these circumstances
15 would be obvious and straightforward. Defendant rendered a valuable service, and Plaintiffs should be
obligated to pay the fair and reasonable value of that service. It is a simple implied contract analysis. That
16 is the result that typically obtains for emergency medical services. However, multiple courts have found
that, in the context of the ADA and air ambulances, courts cannot determine the reasonable compensation
17 to be paid. See, *Scarlett v. Air Methods*, 922 F. 3d 1053 (10th Cir. 2019). It seems that Congress created
this unfortunate scenario, and Congress may need to resolve it. However, the Department of Justice
18 argued in the *Scarlett* case that there was an equitable remedy available in view of *Dan's City Used Cars,
Inc. v. Pelkey*, 569 U.S. 251, 265 (2013). The United States Department of Justice argued as follows in
19 the *Scarlett* appeal:

20         No federal law governs payment disputes between air ambulances and their customers.
21         And, in the absence of either a contract or recourse to state equitable principles,
         defendants would apparently have no legal basis to seek compensation from plaintiffs. It
22         is implausible that Congress, through the enactment of the ADA, intended to prevent
         companies that provide an essential emergency service from obtaining compensation for
23         their services. But, if defendants rely on state equitable principles as the basis for their
         compensation, they cannot at the same time prevent plaintiffs from relying on those same
24         principles to argue that defendants' charges are unreasonable. In short, defendants
         "cannot have it both ways." *Dan's City*, 569 U.S. at 265. And where both air carriers and
25         passengers choose to rely on state equitable law as the basis for their legal obligations,
         that law should not be viewed as "state-imposed," *Ginsberg*, 572 U.S. at 284, but instead
26         as part of "the parties' voluntary undertaking," id. The parties' reliance on such law does
         not enlarge or replace any contractual agreement, see id. at 289, so in this limited
27         circumstance, common-law principles of equity are not preempted by the ADA.

28     Brief for the United States of America filed Nov. 21, 2018 at pp. 28, 29. The Second
Cause of Action is pled consistent with the approach proposed by the United States Department

22

anything, an implied contract and Defendant was obligated to charge the fair and reasonable value of the services and materials it provided to Plaintiffs.

80. Instead of charging Plaintiffs the fair and reasonable value of its services and materials, Defendant breached the implied contracts, including the implied covenant of good faith and fair dealing, by charging inflated prices that bear no reasonable relationship to the services rendered.

81. By any measure, the prices Defendant charged Plaintiffs for transportation services were unreasonable. These prices far exceed the amounts paid by third-party payors, including the "uniform, customary, and reasonable" amount paid by health insurance companies and the amount paid by Medicare and Medicaid for the same services.

82. Defendant will argue that the Airline Deregulation Act permits it to charge any rate with no constraints under state law. In doing so, Defendant contends that it can use state law to enforce a contractual obligation on Plaintiffs, that is an implied contract, but that the implied contract cannot imply the missing price term because of the Airline Deregulation Act. This "have your cake and eat it too" approach has been rejected by the Supreme Court in *Dan's City Used Cars v. Pelkey*, 569 U.S. 251 (2013). To the extent the ADA does not envision an implied contract in an emergent medical situation where there is no free market, this Court should grant declaratory relief under Plaintiffs' first cause of action that Plaintiffs have no obligation to pay or create a similar exception to preemption under the ADA similar to *Dan's City Used Cars*.

83. As a result of Defendant's breach of the implied contracts, Plaintiffs have incurred damages in the amount of the overcharges levied by Defendant. Plaintiff is therefore

---

of Justice, but that approach was rejected by the 10th Circuit in *Scarlett*. For what it is worth, Plaintiffs believe that the approach championed by the Department of Justice is correct.

23

COMPLAINT FOR DAMAGES

entitled to actual damages, pre-judgment interest, and such other relief as set forth in the prayer below.

## PRAYER FOR RELIEF

**THEREFORE**, Plaintiffs, individually and on behalf of the Class of persons described herein, pray for an Order as follows:

a)      Entering an order certifying the Classes (and subclasses, if applicable), designating Plaintiffs as the class representatives, and designating the undersigned as class counsel;

b)      Awarding consequential damages;

c)      Awarding Plaintiffs all costs and disbursements, including attorneys' fees, experts' fees, and other class action related expenses;

d)      Imposing a constructive trust, where appropriate, on amounts wrongfully collected from Plaintiffs pending resolution of their claims herein;

e)      Issuing appropriate declaratory and injunctive relief to declare the rights of Plaintiffs including, but not limited to a declaration that, absent a signed agreement specifying a price, Defendant is precluded from collecting anything from transported patients;

f)      In the alternative, finding that Defendant has breached implied contract and granting damages;

g)      Awarding pre-judgment and post-judgment interest; and

h)      Granting such further relief as the law allows and the Court deems just.

24

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiffs hereby demand a trial by jury on all claims and issues.

3

4     Dated: May 1, 2020                    THOMPSON LAW OFFICES, P.C.

5

6                                        By: _____/s/_____

7                                             Robert W. Thompson
                                              Attorney for Plaintiffs[4]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27 _____

28
          [4] Edward L. White of Oklahoma will seek leave to appear *pro hac vice* in this matter on behalf
       of Plaintiffs.

COMPLAINT FOR DAMAGES

# EXHIBIT 1



P.O. Box 930
West Plains, MO 65775

*Return Service Requested*

patientaccounts@amgh.
Phone: (877) 288-53

online quickly & secure
https://paportal.amgh.us/r

Tray 3 : Piece 536
536 1 MB 0.428
INSP2
DANIELLE KETTLER

||·||··|·|···|||·||·|||··||·||·||··||·|·|·|·|·|||||·|·|·||·||·|·||·|·|||·|·|·||·|··|·||·|||·

**Call #:** 18-12288-
**DOS:** 05/13/2018
**Pt. Name:** J█████Kettler

| DESCRIPTION OF CHARGES | HCPC | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| Base Rate | A0431 | 1.0 | 42500.00 | 42500.00 |
| Loaded Miles | A0436 | 35.0 | 393.00 | 13755.00 |
| All Other Charges | | | | 112.50 |
| | | | Total Charges | $56,367.50 |

| LAST PAYMENTS/CREDITS RECEIVED | CHECK # | PAYMENT DATE | AMOUNT |
|---|---|---|---|
| Payment-Credit Card | 61653272731 | 04/02/2019 | 25.00 |
| Insurance Payment | 0004528687 | 07/11/2018 | 20578.78 |

Total Credits  $20,603.78
**Balance =>  $35,763.72**

---

^DETACH ALONG ABOVE LINE AND RETURN STUB WITH YOUR PAYMENT^
IF THERE ARE ANY CHANGES IN YOUR ADDRESS OR OTHER ACCOUNT INFORMATION PLEASE LET US KNOW. THANK YOU.
Please write your call # in the memo line on your check.

**Call Number:** 18-12288       **TOTAL CHARGE:** $56,367.50       **Patient Name:** J████ Kettler

**Current Balance:** $35,763.72
**Amount Enclosed  $ _____**

Your account balance is past due. Please send payment in full today to resolve your
account balance. I invite you to contact me to discuss repayment options if you are
currently unable to pay the entire balance. Your prompt time and attention to this matter
is required to avoid further collection activities.

Paying by Check authorized   to send the information from your check electronically to your bank for payment. Your account will be debited in the
amount of your check and the transaction will appear on your bank statement. You will not receive your cancelled check back. If we cannot post the
transaction electronically a scanned image of your check will be submitted to the bank for processing. If you have any questions Please contact
your Patient Accounts Representative.

RETURN TO:     REACH Air/Cal Ops   PO Box 930   West Plains, Mo 65775



Patient Name: Kettler, Male



Air Medical Services

### Critical Care Prehospital Report

## Patient Information

**Name:** Kettler, Male
**Address:**

**Age:**
**Gender:** Male

**D.O.B.:** 5/▮/2018
**Race:** White

**Weight:** 4.1 kg

**Mass Casualty Incident:** No
**Number of Patients at Scene:** Single

## Call Type/Location/Disposition

**Call Type:** Medical Transport

**Response Type:** Interfacility Transport
**Location Type:** Hospital

**Incident Address:** Sonoma Valley Hospital
347 Andrieux Street
Sonoma, CA 95476
Sonoma County, United States

**Resp. Mode:** Emergent (Immediate Response)

**Response Delay:** None/No Delay
**Scene Delay:** None/No Delay

**Aircraft land at the Physical Incident Address?:** Yes

**Disposition:** Patient Treated, Transported by this EMS Unit
**Urgency:** Immediate
**Destination Type:** Hospital-Emergency Department

**Destination:** Santa Rosa Memorial Hospital, Montgomery
1165 Montgomery Drive
Santa Rosa, CA 95405
Sonoma County, United States

**Hospital In-Patient Destination:** Hospital-NICU
**Transport Mode:** Emergent (Immediate Response)

**Dest. Determ.:** Regional Specialty Center, Physician's Request

**Transport Delay:** None/No Delay

## Response Times

**PSAP:** Not Applicable

**Unit Disp.:** 05/13/2018 09:55:00
**Enroute:** 05/13/2018 10:21:00

**At Scene:** 05/13/2018 10:51:59

**At Patient:** 05/13/2018 10:55:00

**Prep Complete :** 05/13/2018 11:15:00
**Depart/Transport:** 05/13/2018 11:30:00
**Arrive Dest.:** 05/13/2018 12:07:00
**Transfer of Care:** 05/13/2018 12:15:00
**In Service:** 05/13/2018 12:30:00

**Incident Number:** 18-12288
**Call Sign:** REACH 3
**Veh. #:** N31RX
**Complaint Reported by Dispatch:** Medical Transport

**Report Received from: (Name/Title):** Alexandria, RN

**Transferring Physician / Referring MD:** Detorres,MD

**Care Transferred To (Name/Title):** Shotkin, MD

## Ground Intercept

**Unit Notified:** 05/13/2018 09:55:00
**CAD #:** 18-12288

**Patient Name:** Kettler, Male

**Date Printed:** 05/15/2018 09:06
**Call #:** R3-180113



Patient Name: Kettler, Male

**Was Ground Transportation used for the ENTIRE transport of the patient?:** No

**Was Ground Transportation used to move the patient from the AIRCRAFT to the DESTINATION FACILITY?:** No

**Why was Ground Leg of Transport Necessary?:** no pad at hospital

**Was Ground Transportation used to move the patient from the INCIDENT SCENE/FACILITY to the AIRCRAFT?:** Yes

**Ambulance Service Unit Number (Incident Location to Aircraft):** 301

**Ambulance Service Name that provided Transport from Incident Location to Aircraft?:** Sonoma Valley FD

**Ambulance Service Mileage (Incident Location to Aircraft):** 4

## Unit Personnel

| Crew Member | Level of Certification | Role |
|---|---|---|
| Lacore, Gary | Other Non-Healthcare Professional | Pilot |
| Trost, Melinda | Paramedic | Primary Patient Caregiver-At Scene, Primary Patient Caregiver-Transport |
| Warner, Brian | Registered Nurse | Primary Patient Caregiver-At Scene, Primary Patient Caregiver-Transport |

## Provider Impression

**Primary Impression:** Respiratory Distress - Unspecified     **Secondary Impression:** Newborn

## HPI

---

**Unit Notified:** 05/13/2018 09:55:00
**CAD #:** 18-12288

**Patient Name:** Kettler, Male

**Date Printed:** 05/15/2018 09:06
**Call #:** R3-180113



**Patient Name:** Kettler, Male

**HPI:** Per Alexandria RN, this ex-41.0 male now ▓day old male with a prenatal diagnosis of ▓▓▓▓▓▓▓▓▓▓ with negative prenatal labs. Mom received Amp and Gent for chorioamnionitis and fevers. Thick mec noted at birth and baby initially came out with no respiratory effort. No delayed cord clamping and baby was taken over to warmer, dried, stimulated and suctioned. ▓▓▓▓▓▓▓▓ PPV was applied for several minutes with moderate respiratory effort noted at 5 mins of life. Coarse breath sounds appreciated with significant retractions and tracheal tugging with tachypnea in the 70's. At 10 mins of life, respiratory status improved and at 12 mins of life pt was transferred to the nursery where he was on R/A within minutes. X-ray showed clear lungs at this time.

On 5/12/18: baby continued to do well with no interventions required. Today, baby began to have tachypneic episodes in the 70's with O2 saturations into the 80's. No color change noted and baby would recover within minutes. X-ray today shows possible right pleural effusion. Dr. Detorres consulted with Dr. Shotkin at Santa Rosa Memorial to transfer baby for further evaluation and observation. REACH was activated to transfer baby for possible TTN.

Prior to departure, Warner RN consulted with Shotkin, MD at receiving who gave orders to place baby on 1L O2 if needed during transport. Otherwise, no other inventions expected or required at this time.

### Patient Condition

**Date/Time of Symptom Onset:** 05/13/2018 09:10:00

| Complaint Type | Complaint | Duration |
|---|---|---|
| Chief (Primary) | pt is a neonate | 1 Days |

**Primary Symptom:** Dyspnea
**Alcohol/Drug Use:** None Reported
**Initial Patient Acuity:** Advance Life Support Level of Care Needed
**Final Patient Acuity:** Critical - Life Treatening

### Cardiac Arrest

**Cardiac Arrest:** No

### Trauma

**Possible Injury:** No

### Assessment Exam

**Unit Notified:** 05/13/2018 09:55:00
**CAD #:** 18-12288

**Patient Name:** Kettler, Male

**Date Printed:** 05/15/2018 09:06
**Call #:** R3-180113

Page 3 of 8



**Patient Name:** Kettler, Male

| Time | Eye Exam Summary |
|------|------------------|
| 10:55:00 | **Eye - Bilateral:** 3-mm ; PERLL **Eye - Left: Eye - Right:** |

## Assessment Summary

### 05/13/2018 10:55:00

### Detailed Findings

| Location | Description | Details |
|----------|-------------|---------|
| **Skin** | Capillary Nail Bed Refill less than 2 seconds<br>Dry<br>Normal<br>Warm | good cap refill, brisk centrally |
| **Head** | Normal | no craniofacial anomalies noted, fontanels soft and flat |
| **Face** | Normal | no craniofacial anomalies noted |
| **Eye**<br>Bilateral: | 3-mm | PERLL |
| **Neck** | Normal | supple and flat |
| **Chest/Lungs** | Breath Sounds-Normal-Left<br>Breath Sounds-Normal-Right | no distress noted, no retractions |
| **Heart** | Normal<br>S1<br>S2 | |

### Normal Findings

Mental Status ;  Neurological ;  Pelvis ;

### Not Done

## Past Medical History

### Current Medications

### Medication Allergies

**Medication Allergies**

No Known Drug Allergy

**Medical History**  Health Care Personnel
**Obtained From:**

| | | |
|---|---|---|
| **Unit Notified:** 05/13/2018<br>09:55:00<br>**CAD #:** 18-12288 | **Patient Name:** Kettler, Male | **Date Printed:** 05/15/2018<br>09:06<br>**Call #:** R3-180113 |

**Patient Name:** Kettler, Male

**Advance Directives:** None

## Vitals

### Vitals

| Time | PTA | Crew | BP | MAP | BP Loc | BP Method | Pulse HR Quality Rhythm | HR Method | Resp Effort | SPO2 | SPO2 Qualifier |
|------|-----|------|-----|-----|--------|-----------|------------------------|-----------|-------------|------|----------------|
| 11:00:00 | No | Trost, Melinda | 65/35 | 45 | Right Leg | Cuff - Automated | 104 Normal Regular | Electronic Monitor - Cardiac | 40 | Rapid 94 | At Room Air |
| 11:15:00 | No | Trost, Melinda | 58/36 | 43 | Right Leg | Cuff - Automated | 104 Normal Regular | Electronic Monitor - Cardiac | 44 | Rapid 95 | At Room Air |
| 11:30:00 | No | Trost, Melinda | 56/38 | 44 | Right Leg | Cuff - Automated | 108 Normal Regular | Electronic Monitor - Cardiac | 46 | Rapid 93 | At Room Air |
| 11:45:00 | No | Trost, Melinda | 59/35 | 43 | Right Leg | Cuff - Automated | 105 Normal Regular | Electronic Monitor - Cardiac | 42 | Rapid 95 | At Room Air |
| 12:00:00 | No | Trost, Melinda | 52/36 | 45 | Right Leg | Cuff - Automated | 96  Normal Regular | Electronic Monitor - Cardiac | 48 | Rapid 93 | At Room Air |
| 12:15:00 | No | Trost, Melinda | 59/36 | 44 | Right Leg | Cuff - Automated | 101 Normal Regular | Electronic Monitor - Cardiac | 45 | Rapid 94 | At Room Air |

### Vitals

| Time | PTA | Crew | Pain Score | EKG |
|------|-----|------|-----------|-----|
| 11:00:00 | No | Trost, Melinda | 0 Wong-Baker (FACES) | Normal Sinus Rhythm |
| 11:15:00 | No | Trost, Melinda | 0 Wong-Baker (FACES) | Normal Sinus Rhythm |
| 11:30:00 | No | Trost, Melinda | 0 Wong-Baker (FACES) | Normal Sinus Rhythm |
| 11:45:00 | No | Trost, Melinda | 0 Wong-Baker (FACES) | Normal Sinus Rhythm |
| 12:00:00 | No | Trost, Melinda | 0 Wong-Baker (FACES) | Normal Sinus Rhythm |
| 12:15:00 | No | Trost, Melinda | 0 Wong-Baker (FACES) | Normal Sinus Rhythm |

### Glasgow Coma Score

| Time | PTA | Crew | GCS Score | Eye | Motor | Verbal | GCS Qualifier |
|------|-----|------|-----------|-----|-------|--------|---------------|
| 11:00:00 | No | Trost, Melinda | 15 | 4 - Opens Eyes spontaneously | 6 - Obeys commands (>2Years); Appropriate response to stimulation | 5 - Oriented (>2 Years); Smiles, oriented to sounds, follows objects, interacts | Not Applicable |
| 11:15:00 | No | Trost, Melinda | 15 | 4 - Opens Eyes spontaneously | 6 - Obeys commands (>2Years); Appropriate response to stimulation | 5 - Oriented (>2 Years); Smiles, oriented to sounds, follows objects, interacts | Not Applicable |
| 11:30:00 | No | Trost, Melinda | 15 | 4 - Opens Eyes spontaneously | 6 - Obeys commands (>2Years); Appropriate response to stimulation | 5 - Oriented (>2 Years); Smiles, oriented to sounds, follows objects, interacts | Not Applicable |
| 11:45:00 | No | Trost, Melinda | 15 | 4 - Opens Eyes spontaneously | 6 - Obeys commands (>2Years); Appropriate response to stimulation | 5 - Oriented (>2 Years); Smiles, oriented to sounds, follows objects, interacts | Not Applicable |
| 12:00:00 | No | Trost, Melinda | 15 | 4 - Opens Eyes spontaneously | 6 - Obeys commands (>2Years); Appropriate response to stimulation | 5 - Oriented (>2 Years); Smiles, oriented to sounds, follows objects, interacts | Not Applicable |
| 12:15:00 | No | Trost, Melinda | 15 | 4 - Opens Eyes spontaneously | 6 - Obeys commands (>2Years); Appropriate response to stimulation | 5 - Oriented (>2 Years); Smiles, oriented to sounds, follows objects, interacts | Not Applicable |

**Unit Notified:** 05/13/2018 09:55:00
**CAD #:** 18-12288

**Patient Name:** Kettler, Male

**Date Printed:** 05/15/2018 09:06
**Call #:** R3-180113

Page 5 of 8



**Patient Name:** Kettler, Male

**Time Notes::** 10:55 Report from Alexandria RN at bedside, mother and grandmother present. Baby is laying in open warming table with good respiratory and SpO2 noted on monitor. Baby appears to be in no distress, has good skin signs, good cap refill peripherally and brisk refill centrally and and acts appropriately to stimuli. Good moro and suck present. Soft flat fontanels and liver palpated 1-2 cm below costal margin. Dry diaper at this time with report of good output since birth.

11:15 Baby nestled in isolette and all paperwork signed. RN still putting packets together and CD verified. No IV needed as baby has been feeding. Glucose and temps stable since birth. Pacifier and sweet-ease offered with good effect.

12:50 No change en route and no sign of distress or increased work of breathing.

12:15 Arrived into NICU and report given to RN and MD at bedside. Baby cries in response to stimuli and still no distress or change observed. All questioned answered prior to leaving. TT phoned mother who was arriving shortly.



### Treatment

| | |
|---|---|
| **Medication Time Out (including patient 8 rights) practiced for all medication administrations:** | Yes |

### Neonatal

| | |
|---|---|
| **Delivery Date:** | 05/11/2018 19:19:38 |
| **Gestational Age:** 40    **GestationalAgeDays:** | 0 |
| **Neonate Resuscitation:** | Bag Valve Mask (BVM) |
| **Neonate APGAR 1 Minute:** | 4 |
| **Neonate APGAR 5 Minutes:** | 8 |
| **Neonate APGAR 10 Minute:** | 8 |

### Maternal/Delivery

| | |
|---|---|
| **Mother Age:** | |
| **Mother Anesthesia:** | None |
| **Mother Amniotic Fluid:** | M |
| | **Steroids:** |

### Fluid Intake and Output

### Lab / Radiology

| | | |
|---|---|---|
| **Unit Notified:** | 05/13/2018 09:55:00 | |
| **CAD #:** | 18-12288 | |
| **Patient Name:** | Kettler, Male | |
| **Date Printed:** | 05/15/2018 09:06 | |
| **Call #:** | R3-180113 | |

**Patient Name:** Kettler, Male

## Labs / Radiology Results

| PTA | Laboratory Result Summary | Radiology Result Summary |
|---|---|---|
| Yes | | X-ray: possible right plural effusion; |



Plt
267

%

### Combined Labs Panel

**Time:**

Plt
k/mcl

RBC          Hct

### Care Labs Summary

*Lab Results*

---

### Flight Information

#### Flight Informations

| Flight Info Date | Ambient Temp C | Patient Hearing Protection |
|---|---|---|
| 11:55:00 | 20 | Yes |

**Personal Protective Equipment (PPE) used during this incident?:** Yes

#### Personal Protective Equipment Used

**Item Used**

Gloves

---

### Patient Transport/Positioning

**Patient Moved to Aircraft/Ambulance:** Isolette

**Patient's Position in Transport:** Supine

**Patient Moved From Aircraft/Ambulance:** Isolette

---

### Billing Information

**Unit Notified:** 05/13/2018 09:55:00
**CAD #:** 18-12288

**Patient Name:** Kettler, Male

**Date Printed:** 05/15/2018 09:06
**Call #:** R3-180113



**Patient Name:** Kettler, Male

**Payment:** No Insurance Identified

## Signatures

**Type of Person Signing:** Crew Member

**Signature Reason:** EMS Provider

**Paragraph Text:**

**Status:**

**Printed Name:** Melinda Trost

**Signature Date:** 05/13/2018 13:40:37

**Type of Person Signing:** Crew Member

**Signature Reason:** EMS Provider

**Paragraph Text:**

**Status:**

**Printed Name:** Brian Warner

**Signature Date:** 05/13/2018 20:32:17

**Unit Notified:** 05/13/2018 09:55:00     **Patient Name:** Kettler, Male     **Date Printed:** 05/15/2018 09:06
**CAD #:** 18-12288                                                                                 **Call #:** R3-180113

# EXHIBIT 2

**REACH** Medical Holdings, LLC

CALSTAR    CareConnect    AIR CARE
CAL-ORE Life Flight    REACH air medical    Mercy Air Care

P.O. Box 930
West Plains, MO 65775

*Return Service Requested*

patientaccounts@amgh.u
Phone: (877) 288–534(



online quickly & securely
https://paportal.amgh.us/rc

Tray 5 : Piece 1560
1560 1 MB 0.428
SPLEGAL
WILLIAM H. LENTZ JR

Call #: 19-10930-
DOS: 04/20/2019
Pt. Name: L�â–ˆâ–ˆâ–ˆ Lentz

| DESCRIPTION OF CHARGES | HCPC | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| Base Rate | A0431 | 1.0 | 45475.00 | 45475.00 |
| Loaded Miles | A0436 | 25.0 | 421.00 | 10525.00 |
| All Other Charges | | | | 435.05 |
| | | | Total Charges | $56,435.05 |

| LAST PAYMENTS/CREDITS RECEIVED | CHECK # | PAYMENT DATE | AMOUNT |
|---|---|---|---|
| Private Payment / Check | 1520 | 10/10/2019 | 25.00 |
| Private Payment / Check | 1511 | 09/17/2019 | 25.00 |
| | | Total Credits | $50.00 |
| | | Balance => | $56,385.05 |

*CALL IN*
*CAL STAR*
*$25.00*

*$50.00*

*12/09/19    C# 112161*